**In re ERICKSON.**

**No. 22172.**

District Court, W. D. New York.

Feb. 24, 1936.

Milton A. Bissell, of Jamestown, N. Y., for bankrupt.

Cheston A. Price, of Jamestown, N. Y., for objecting creditor, opposing discharge.

854

RIPPEY, District Judge.

The bankrupt filed a voluntary petition on August 28, 1934, and was on that day adjudicated bankrupt. In his schedules he listed but two creditors, one of whom was the Smith & Horton Company, of Warren, Pa., which held a judgment against the bankrupt and one Arthur Larson, docketed in the Chautauqua county clerk's office July 11, 1934, which the bankrupt alleged was based upon a promissory note given to the creditor on June 15, 1933, jointly with Arthur Larson for whose accommodation petitioner signed the note as stated in the schedules. The amount of this obligation was $1,107.05, according to the schedules. The other creditor was Axel E. Andreen, Jamestown, N. Y., to whom the bankrupt alleges that he owed $100 for borrowed money. In his assets he scheduled one share of stock in the Dependable Metal Products Corporation of Jamestown of the par value of $100, on which he claimed exemption; one share of stock in the Jamestown Economy Stations, Inc., which he said was worthless; four shares of stock in the Nordic Temple Corporation, on which he placed a value of $25; and a $2,000 life insurance policy with the Lutheran Brotherhood Insurance Company of Minneapolis, in which he named Christina Erickson, his wife, as beneficiary, and which is claimed to be exempt under section 55-a of the New York State Insurance Law (Consol.Laws N.Y. c. 28). He claimed that certain household goods and wages specified were exempt.

The matter was referred to Joseph C. White, referee in bankruptcy, and on September 27, 1934, the referee appointed Warren W. Johnston, of Jamestown, N. Y., as trustee, who thereafter qualified and entered upon the discharge of his duties as such. On January 23, 1935, the trustee made his final report. The report was passed upon and the estate closed. Upon closing the estate, all of the right, title, and interest of the trustee in the land contract dated May 1, 1926, for the sale of certain premises known as lot 11, section B, of the Brooklyn Park allotment of the city of Jamestown, N. Y., to George E. Swanson and Laurina E. Swanson, his wife, was sold to the Smith & Horton Company, creditor, for $1, and a conveyance thereof, pursuant to the order of the referee, was made by the trustee on February 22, 1935. The stocks mentioned in the trustee's report were declared to be worthless and were duly abandoned by order of the referee. The Smith & Horton Company filed a claim in the proceedings for $1,107.05. The trustee was discharged on April 3, 1935.

On March 21, 1935, the bankrupt filed a petition for discharge. On May 15, 1935, specifications of objections to the discharge of the bankrupt were filed by Smith & Horton Company, creditor. The creditor specifies, as objections to the discharge, (1) that the bankrupt committed an offense punishable by imprisonment under the Bankruptcy Act (11 U.S.C.A.) in that he knowingly and fraudulently made a false oath and rendered a false account in relation to his proceedings in bankruptcy, more particularly in that he filed his schedules under the name of A. Gust Erickson, when as a matter of fact his true name was A. Gust Jorenson, and in that he stated in his schedules that he did not own any real estate, when as a matter of fact he owned a substantial interest in real estate in the city of Jamestown, N. Y.; (2) that he committed an offense under the Bankruptcy Act in that he knowingly and fraudulently concealed while a bankrupt from his trustee assets belonging to his estate consisting of property known as lots 11 and 12, section B, located on the south side of Chambers street in the city of Jamestown, N. Y., conveyed to him by deed and thereafter conveyed to his wife on February 10, 1934, by deed recorded in the Chautauqua county clerk's office on February 13, 1934, in Liber 480 of Deeds at page 473, at a time when he was insolvent, the conveyance being made without consideration for the purpose of defrauding his creditors and for the purpose of placing his property beyond the reach of his creditors and that his wife was in fact, pursuant to the agreement between him and his wife, holding the property in trust for him, together with his interest in a land contract on which there was due some $3,000 for the purchase and sale of the aforesaid lot 11 to George E. Swanson and wife; (3) that he has failed to keep books of account and records from which his financial condition might be ascertained; and (4) that within one year prior to the filing of the petition he had transferred, removed, and concealed the aforesaid real property and also a certain Chevrolet automobile of the value of $300 and seven shares of stock in the Dependable Metal Products Corporation of the value of $700 for the purpose and with the intent to hinder, delay, and de-

fraud his creditors. The issue thus formed was referred to Joseph C. White as referee to ascertain and report the facts with his conclusions thereon by order dated May 20, 1935. Thereafter Mr. White held hearings and took testimony and closed the hearings thereon, but died before making his report. Thereupon the matter was referred to Arthur B. Towne as referee. No testimony was taken or witness produced before Mr. Towne, but he took the record as made by Mr. White and filed his report on January 22, 1936, in which he found substantially that the objections should be sustained and recommended that the bankrupt should be denied his discharge. Inasmuch as the testimony in the case was not taken before the referee who made the report and he neither saw nor heard the witness testify, the referee has no advantage over the court, nor is he any better qualified than the court in determining the weight and sufficiency of the evidence to establish the facts.

■ When the hearing was had before referee White, the objecting creditor called only a single witness, and that was the bankrupt himself, and examined him orally in an effort to sustain the specifications of objection. The testimony is to be treated the same as that of any other witness. In view of the policy of Congress in the enactment of the bankruptcy law to relieve honest and distressed debtors, in a proper case, from their obligations, the evidence to sustain the objections to the discharge should be clear and convincing, and no inference should be drawn therefrom not clearly sustained by the evidence. In re Braun (C.C.A.) 239 F. 113, 114; In re Braus (C.C.A.) 248 F. 55, 58. The objecting creditor presented the bankrupt as his witness, as his sole witness, and as a credible witness, and is bound by his testimony, and he cannot be impeached or assailed by the objecting creditor. Pollock v. Pollock, 71 N.Y. 137, 152. His testimony cannot be ignored. Freed v. Central Trust Co. (C.C.A.) 215 F. 873, 876. In the absence of its being inherently improbable, it not being materially contradicted by other evidence, the objecting creditor is bound by it. Carlisle v. Norris, 215 N.Y. 400, 109 N.E. 564, Ann.Cas.1917A, 429; Pastene & Co. v. Irving National Bank, 249 N.Y. 272, 164 N.E. 49; Pollock v. Pollock, supra. Even so, there is no testimony in the case except that of the bankrupt and it is upon his testimony that reliance must be placed for decision here. The objecting creditor conducted the examination upon the apparent assumption that he was entitled to cross-examine and, if possible, impeach his own witness. A considerable part of the examination was conducted along this line and was not objected to, although objections, if made, would probably have been sustained by the referee. Examining the record in the light of the foregoing authorities, the report of the referee upon the facts and his recommendations cannot be sustained.

■ Substantially all of the objections turned upon the propriety of the transfer by the bankrupt (1) to his wife of real property which stood in his name more than six months prior to the filing of the petition and of certain stock in the Dependable Metal Products Corporation, and (2) to his son of a Chevrolet automobile. The two lots in question were purchased in November, 1913, for $180 and the moneys for the purchase of the lots were in whole or for the most part furnished by the wife of the bankrupt. Title to the lots was taken in the name of the bankrupt, but the facts appearing in the record negative any claim on the part of the objecting creditor that that fact establishes ownership in the bankrupt. All of the moneys earned by the bankrupt were delivered to his wife and she was the financial head of the combination. Later, when a house was built upon lot 11, the moneys used for the construction of the house were moneys loaned to the wife and through her instance and solely on her account by her parents. A mortgage was given back for the money loaned and made by both the bankrupt and his wife. The bankrupt testified that he did not know that he had given back a mortgage upon the property. That was many years prior to the adjudication. The money paid for the stock came through a loan on the property. The moneys derived from payments on the Swanson land contract were used toward the construction of a house on lot 12, the balance of the moneys being borrowed on bond and mortgage covering the two lots from the American National Bank. When the father of the bankrupt's wife died in 1919, he left a net estate of $3,946.11, and Mrs. Erickson was one of two heirs to inherit. The balance due on the mortgage given as security for the moneys originally loaned to the wife, aggregating $1,162, was a part of the estate, and that mortgage was canceled as part of the distributive share in the father's estate belonging to Mrs.

Erickson. In addition to that, Mrs. Erickson received some moneys from the estate and this went into the properties. Some years before the adjudication the mother had loaned to the bankrupt and his wife, solely on the wife's credit, moneys with which in part to buy an automobile, and through exchanges and otherwise the bankrupt acquired title to the Chevrolet automobile in question later on. The bankrupt himself had no property. His only income was from his daily wages as a carpenter, and those were all turned over to his wife. For some period of time the wife kept boarders, and that money was used for living expenses. The bankrupt testified that his wife borrowed money on her own note to pay taxes on the real property. He was asked why he gave the deed to the real property to his wife, and he testified:

"We have always talked about having it turned over to my wife because she said, 'I have got money and my father was in this country and worked for money, and it is my money that has been going into it and I want it deeded to me.

"Q. When was that first talked about being put in her name? A. First, I could not say. That has been for years back."

He testified that the property was hers and that she insisted on having it deeded to her. For more than a year and six months prior to the bankruptcy, one of the properties was leased at $25 per month and the wife collected and retained the rents or used them to reduce obligations against the properties or for living expenses. All moneys actually going into the real estate were either moneys contributed by the wife through loans from her parents made solely on her own account or moneys borrowed from the bank or from the payments made on the land contract with Swanson, which was later abandoned and canceled some eighteen months prior to the bankruptcy. As to the purchase of the Chevrolet car in 1930, the bankrupt testified that one of his boys, who was then in school, contributed $50 on account of the purchase price of the car, and that when the time came that he was out of work and could not keep the car up, the car was transferred to the boy, who afterwards maintained it, paid the expenses of maintenance and repairs, and it was used as a family car. There is no evidence whatever as to its value at the time of the transfer. Neither is there any evidence by way of an appraisal or otherwise to indicate that there was any equity in the real property at the time the property was transferred from the bankrupt to his wife. While the cost of the property is some evidence as to value, yet the moneys put into the property were expended at a time when costs of material and construction were high and during the period of prosperity and cannot be deemed any real evidence of market value at the time the transfer was made. It is clear upon all the record that the wife was the equitable owner of the property, that she got back only what she really owned, and that there was no intent on the part of the bankrupt to make any of the transfers for the purpose of hindering, delaying, or defrauding his creditors, and it follows, of course, that there was no concealment because of his failure to schedule his property, which he rightfully and in truth and in fact did not own or have any interest in.

It is said in the Braus Case, supra, quoting from Remington on Bankruptcy, that:

"The act is very liberal towards the bankrupt as to his discharge, and strict construction of the terms under which opposition will be sustained are had in favor of the bankrupt's discharge."

In the same case, quoting from Black on Bankruptcy, it is said:

"The 'refusal of a discharge does not rest in the discretion of the judge, but the applicant is entitled to a discharge as a matter of right, unless he is found guilty of some one of the prescribed acts or omissions.' "

And in the Braun Case, supra, it is said:

"The rule is well established, and is not questioned here, that the opposing creditors have the burden of proof on opposition to discharge. * * * The presumption is that men are honest, and one who charges to the contrary must offer clear and convincing proof, if this presumption of the law is to be overcome. The contrary must be shown by a preponderance of testimony."

The note for $1,000 dated June 15, 1933, given to Smith & Horton Company, the objecting creditor, was payable on demand and was signed by Arthur Larson and the bankrupt. The money for which this note was given was loaned to Larson and was used by him in connection with the establishment of a grocery business. The evidence indicates that the bankrupt had no benefit from this loan and was merely an

accommodation maker and understood to be such by the objecting creditor.

The findings of the referee in so far as in accordance with this decision are approved, but those not in accordance with this decision, as well as the conclusion of law to the effect that the bankrupt should be denied his discharge, are disapproved. The bankrupt may within five days prepare new findings in accordance with this decision and submit them for signature, whereupon an order will be entered directing that the objections of the creditor be overruled and that the bankrupt be granted a discharge.